475 S.E.2d 166

**In re The 1994 ASSESSMENTS OF the PROPERTY OF Massimo A. RIGHINI, Marilou M. Righini, J. David Magistrelli and Diane Magistrelli, Taxpayers, Appellees.**

No. 22948.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 17, 1996.

Decided July 19, 1996.

Michael E. Caryl, Bowles Rice McDavid Graff & Love, Martinsburg, for Appellees.

Richard G. Gay, Berkeley Springs, for Morgan County Commission.

RECHT, Justice:

This case requires us to resolve the scope of the authority of the Assessor and the County Commission of Morgan County, sitting as a Board of Equalization and Review, pursuant to W. Va.Code 11–3–1 (1977) and 11–3–24 (1979). The specific issue concerns whether the Assessor and the County Commission have the power to rescind a decision by the Division of Forestry, of the Department of Commerce, Labor and Environmental Resources, which certified certain parcels of real estate to be managed timberland.[1] We hold that the county commission's power to "fix property" at its true and actual value, pursuant to W. Va.Code 11–3–24, includes the power to increase or decrease the value, which in turn, includes the power to rescind the certification made by the Division of Forestry of managed timberland, because that certification affects the value of real property.

---

1. As we discuss in this opinion, the process of the valuation of real property in West Virginia involves the assessor and the county commission, under supervision of the State Tax Commissioner. W. Va.Code 11–1–2 (1933); W. Va.Code 18–9A–11 (1993). For purposes of this opinion, we will discuss the underlying issue as to the authority to value property only between the county commission, sitting as a Board of Equalization and Review, and the Division of Forestry, because that is the manner the issue was presented on appeal.

Before we begin an analysis of the question under review, it is appropriate to discuss the concept of "managed timberland." The root of the question upon review is what office or agency has the power to certify real property as managed timberland. The Legislature, in 1990, created a separate category of real property for property tax purposes designated as managed timberland.[2]

The formulation of determining the true and actual value of managed timberland is an outgrowth of a recognition that traditional methods of determining fair market value are not relevant to the mass valuation of timberland given the unique nature of this resource which acknowledges a tax based on the "productivity of the site rather than the standing timber." Dr. David E. White, Timberland Valuation Under the Statewide Reappraisal, Seminar, West Virginia State Bar Ass'n. (June 23, 1985).

The formula applied by the State Tax Commissioner after property is certified as managed timberland reaches a value substantially lower than traditional market value. However, the valuation has been determined by the Legislature to conform to the reality of placing a value on natural resources that is compatible with both an equitable and long-term economic development of the forestry industry.[3]

The issue we decide today does not question the wisdom of the managed timberland valuation scheme. We are concerned only with the narrow question of who has the power to qualify a parcel of property as managed timberland—the county commission sitting as a Board of Equalization and Review, or the Division of Forestry.

## I.

## FACTS

This case involves nine parcels of real estate owned by Massimo A. Righini, Marilou M. Righini, J. David Magistrelli and Diane Magistrelli (hereinafter "Taxpayers"). The parcels are located in Rock Gap District, Morgan County, West Virginia (hereinafter "Property"). The Property, approved as a subdivision in 1989, was encumbered by a restrictive covenant which expressed that the Property was to be used only for residential purposes, with no offensive trade or activity to be conducted on the Property. The Taxpayers revised this covenant on February 28, 1994, by expanding the use to be conducted on the Property to include activities appropriate with the Property being considered managed timberland pursuant to W. Va.Code 11–1C–10(d) (1994) and W. Va.C.S.R. § 110–1H–1 to –15.[4]

Since 1991, the Taxpayers requested and received certification of the Property as managed timberland. However, for tax year 1994 (relating to the Property's use as of July 1, 1993), the Taxpayers were informed by the Assessor of Morgan County that the Property was appraised at $379,400.[5]

The assessor's appraised value of $379,400 was based on actual market value. In contrast, if the managed timberland certification

2.  W. Va.Code 11–1C–2(b) (1990) defines managed timberland as follows:

> "Managed timberland" means surface real property, except farm woodlots, of not less than ten contiguous acres which is devoted primarily to forest use and which, in consideration of their size, has sufficient numbers of commercially valuable species of trees to constitute at least forty percent normal stocking of forest trees which are well distributed over the growing site, and that is managed pursuant to a plan provided for in section ten [§ 11–1C–10] of this article.

3.  Once a parcel of real property is certified as managed timberland, the value of this property is then calculated by a formula established by the State Tax Commissioner based on the potential of the managed timberland to produce net income. It is substantially lower than the actual market value of the same parcel of property which is not designated as managed timberland. Timberland that does not qualify for identification as managed timberland is valued at market value. W. Va.Code 11–1C–5(a)(2)(B) (1990).

4.  The revised covenant recited that it was retroactive to June 19, 1989.

5.  The appraised value is synonymous with market value. The assessed value of the Property, using the statutory sixty percent adjustment between appraisal and assessment, was $232,640.

had been used, the actual market value utilizing the State Tax Commissioner's formula would have been $13,871.61.[6]

On February 2, 1994, the Taxpayers, in protest to the assessor's disregard of the Property being valued as managed timberland, filed a request for review before the County Commission of Morgan County, sitting as a Board of Equalization and Review pursuant to W. Va.Code 11–3–24 (1979).

The Taxpayers argued before the Board of Equalization and Review that because the Division of Forestry had certified the Property as managed timberland, then neither the assessor nor the Board had the power to rescind that certification. The Board disagreed and by notice dated March 2, 1994, informed the Taxpayers that their request to classify the Property as managed timberland was denied and the market value for the Property was $277,700.[7]

The Board's decision was appealed to the Circuit Court of Morgan County upon the single issue of "what government office or offices has or have the authority to classify property as managed timberland for ad valorem property tax purposes." The Circuit Court of Morgan County concluded that under W. Va.Code 11–1C–11 (1990), only the Division of Forestry has the power and authority to classify property as managed timberland for ad valorem tax purposes. It is from this decision that the County Commission of Morgan County appeals.

6. The assessed value of the Property, certified as managed timberland, using the statutory sixty percent adjustment between appraisal and assessment, would be $8,325.35.

7. No reason was given by the Board for the reduction of the assessor's appraisal of $379,400 to $277,700.

8. When we use the term real and personal property in this opinion, we are only discussing non-public utility property. The taxation of property belonging to public utilities is the responsibility of the State Board of Public Works. W. Va.Code 11–6–1 to –26.

9. Because much of the revenue generated from property taxes is used to finance public schools, various statutory provisions relating to public school financing bleeds into the general property tax provision, *e.g.*, W. Va.Code 18–9A–11 (1993)

## II.

## DISCUSSION

■ The taxation of real and personal property is a complex process.[8] Reduced to its basic elements, however, the process involves the valuation of property and applying a rate of taxation upon that valuation. *Killen v. Logan County Comm'n*, 170 W.Va. 602, 295 S.E.2d 689 (1982). The former phase is sometimes referred to as assessment, and the latter as levying. It is the levy process that brings the determination of the ultimate question—how much tax is owed? We are only concerned with the launching point of the process, which is the valuation of property.

The valuation process begins with the assessment of property. The premise upon which the entire assessment process is built is that the State Tax Commissioner has the power of supervising the entire valuation process. W. Va.Code 11–1–2 (1933); W. Va. Code 18–9A–11 (1993).[9]

Subject then to the State Tax Commissioner's overriding authority, the Legislature has directed the assessor to assess all property annually as of July 1 at its true and actual value.[10] W. Va.Code 11–3–1 (1977).

We had occasion in *Killen* to examine exhaustively the entire sweep of the constitutional and statutory design of determining and establishing real and personal property taxes in this State. Much has changed since the publication of *Killen*;[11] however, the basic modalities of the property tax system

requires the State Tax Commissioner to appraise all non-utility real and personal property in each county based on its "true and actual value," as required under W. Va.Code 11–3–1 (1977).

10. True and actual value is defined as "the price for which such property would sell if voluntarily offered for sale by the owner." W. Va.Code 11–3–1 (1977).

11. The Property Tax Limitation and Homestead Exemption Amendment of 1982 was a direct consequence of the *Killen* decision, which eradicated the permissible rate of fifty percent variation between appraised and assessed values and established a fixed sixty percent ratio of appraised/assessed values. W. Va. Const. Art. X, § 1b.

have survived to guide this opinion. We recognized in *Killen* that "[i]t is the responsibility of the county assessors, beginning with the property owner's appraisal, to fix the property's 'true and actual value,' subject to executive, legislative and judicial oversight." *Killen,* 170 W.Va. at 607, 295 S.E.2d at 694. We continued, "[t]he valuation-levying process begins with the assessment of property. The state constitution provides that each county may elect not more than two assessors. W. Va. Const. art. [IX], § 1. The duties of assessors are prescribed by statute. W. Va.Code § 11–3–1 directs that the assessors 'assess' property yearly as of July 1 at its 'true and actual value.'" *Id.* at 608, 295 S.E.2d at 695.

This concentration of power in the office of assessor in determining the assessed value of real property is manifest. Indeed, if the assessor knowingly fails to assess all property at its true and actual value, then the following can occur:

If at any time after the beginning of the assessment year, it be ascertained by the tax commissioner that the assessor . . . is failing, neglecting or refusing after five days' notice to list and assess all property therein at its true and actual value, the tax commissioner may order and direct a reassessment of any or all of the property in any county, district or municipality, where any assessor, or deputy, fails, neglects or refuses to assess the property in the manner herein provided. . . .

12. W. Va.Code 11–3–19 (1967) provides, in pertinent part, as follows:

The assessor shall complete his assessment and make up his official copy of the land and personal property books in time to submit the same to the board of equalization and review not later than February first of the assessment year.

13. W. Va.Code 11–3–24 (1979) provides, in pertinent part, as follows:

The county commission shall annually, not later than the first day of February, meet for the purpose of reviewing and equalizing the assessment made by the assessor. . . . They shall correct all errors in the names of persons, in the description and valuation of property, and they shall cause to be done whatever else may be necessary to make the valuation com-

Any assessor who knowingly fails, neglects or refuses to assess all the property of his county, as herein provided, shall be guilty of malfeasance in office, and, upon conviction thereof, shall be fined not less than one hundred nor more than five hundred dollars, or imprisoned in the county jail not less than three nor more than six months, or both, in the discretion of the court, and upon conviction, shall be removed from office.

W. Va.Code 11–3–1 (1977).

▪ The Legislature has, without equivocation, infused the office of the assessor with the authority and responsibility of assuring that all species of real and personal property are assessed at their true and actual value. After the assessor has completed his assessment, the assessor prepares the property books containing the assessment values, which are required to be delivered to the county commission, sitting as the Board of Equalization and Review, by February first of each year. W. Va.Code 11–3–19 (1967).[12]

After the property books containing the assessment values are delivered to the county commission, sitting as the Board of Equalization and Review, the commission must review the assessments and determine if they are at true and actual value. W. Va.Code 11–3–24 (1979).[13]

Finally, a majority of the county commission must certify that the annual assessment of property at true and actual value has been completed. W. Va.Code 11–3–24.[14] Thereafter, the levying process commences.

ply with the provisions of this chapter. . . . If the commission determine that any property or interest is assessed at more or less than its true and actual value, it shall fix it at the true and actual value. But no assessment shall be increased without giving the property owner at least five days' notice, in writing, and signed by the president of the commission, of the intention to make the increase.

14. W. Va.Code 11–3–24 (1979) provides, in pertinent part, as follows:

After the county commission completes the review and equalization of the property books, a majority of the commission shall sign a statement that it is the completed assessment of the county for the year; then the property books shall be delivered to the assessor and the levies extended as provided by law.

Where in this paradigm is the Division of Forestry? Obviously, the Legislature did not intend for the Division of Forestry to share any authoritative role in fixing the assessment of real property, because the entire statutory process of establishing the true and actual value of real property omits any reference to agencies or offices other than the assessor and county commissions, sitting as a Board of Equalization and Review. Just as obvious, the Legislature intended that the Division of Forestry should be functionally involved, ancillary to the assessment process by using its expertise in determining whether a parcel of real property qualifies for certification as managed timberland under W. Va. Code 11–1C–2(b).[15]

We can reach no other conclusion than the Division of Forestry is the agency designated to inspect property that a taxpayer contends to be managed timberland to determine if that property qualifies for managed timberland certification. We do not agree that W. Va.Code 11–1C–11 (1990)[16] represents the legislative expression that vests managed timberland assessment authority in the Division of Forestry. This statutory provision authorizes the Division of Forestry to assist other taxing authorities in the managed timberland certification process, but does not preempt the assessor and county commission from their ultimate authority and responsibility of determining the true and actual value of real and personal property.[17] If the Legislature intended W. Va.Code 11–1C–11 to endow the Division of Forestry with such authority so as to replace the assessor and the county commission in its assessment role, then the Legislature can and should have clearly indicated their intention to do so. We recognize as a rule of statutory construction that if a statute is designed to alter or unsettle a general statute or system of statutory provisions, then the Legislature must specifically indicate its intention to do so:

> In determining the meaning of a statute, it will be presumed, in the absence of words therein, specifically indicating the contrary, that the legislature did not intend to innovate upon, unsettle, disregard, alter or violate ... a general statute or system of statutory provisions, the entire subject matter of which is not directly or necessarily involved in the act.

Syllabus Point 27, in part, *Coal & Coke Ry. Co. v. Conley*, 67 W.Va. 129, 67 S.E. 613 (1910); *see State ex rel. Pinson v. Varney*, 142 W.Va. 105, 115–16, 96 S.E.2d 72, 77–78 (1956). If the Legislature had intended to preempt the assessor and the county commission in their respective roles in the assessment process, it would have said so specifically. Absent any specific instruction by the Legislature, we cannot disturb the extant system of valuation of real and personal property.

The Taxpayers in this case were not without a remedy to seek review of the decision of the county commission, sitting as the Board of Equalization and Review, when it refused to assess the Property as managed timberland. The Taxpayers chose only to challenge the decision of the Board of Equalization and Review in terms of its jurisdiction to rescind the certification of the Department of Forestry, rather than attacking the underpinnings of their decision. Is there a factual basis to certify the Property as managed timberland which would result in substantially reducing the Property's assessment?

---

15. *See supra* note 2 for the text of W. Va.Code 11–1C–2(b) (1990).

16. W. Va.Code 11–1C–11 (1990) provides:
    Upon request of state, county or other taxing authorities of appropriate jurisdiction, the division of forestry shall inspect property under contract as managed timberland and determine whether or not such properties do qualify. In the event that a property is found not to qualify by reason of a change in use, or it is discovered that a material misstatement of fact was made by the owner in the certification required in subdivision (1), subsection (d), section ten [§ 11–1C–10(d)(1) ] of this article, the division of forestry shall notify the state tax commissioner that the property is disqualified from its identification as managed timberland.

17. W. Va.Code 11–1C–10(g) (1994) prescribes the evaluation of natural resources property, including managed timberland, that provides the protocols for an assessor to question the appraisal of the natural resources property. However, that statutory provision has not been cited or relied upon by the parties as being relevant to the resolution of the issues in this case.

That question is not before us because the Taxpayers chose not to place it before the trial court. Our general rule is that when non-jurisdictional questions have not been refined, developed and adjudicated by the trial court, they will not be decided on appeal in the first instance. *See,* Syllabus Point 2, *Sands v. Security Trust Co.,* 143 W.Va. 522, 102 S.E.2d 733 (1958); *see also Whitlow v. Board of Educ.,* 190 W.Va. 223, 226, 438 S.E.2d 15, 18 (1993).

The decision of the Circuit Court of Morgan County is hereby reversed.

Reversed.